## CHARLES F. MACLARY

### *vs.*

### JOHN P. REZNOR AND WILLIAM WILDS, SHERIFF.

*Kent, Sept. T., 1870.*

R., having recovered judgment against M., under which execution had been taken, and property levied on, sufficient to satisfy the entire judgment, made a settlement upon payment of less than the amount of the judgment, and executed a formal release, under seal, of "all further liability" on the judgment, Held, that being an executed contract under seal, no consideration was necessary to make it effectual.

Part payment of a debt is not a sufficient consideration to support an executory promise to discharge the debtor, and where there is an agreement to release a debt, on the part payment of it, still remaining *in fieri*, the defence of want of a valid consideration for it, will be available. But a release, under seal, complete in its terms and duly executed, needs no consideration to support it, beyond what the seal imports. It will be effectual, even if it be wholly gratuitous, and without the payment of one cent by the debtor.

A man may give a voluntary bond, or he may gratuitously release, to another, any right whatever, provided he does not thereby defraud his creditors, and execute the bond release, or other instrument, with the due legal solemnities, as by writing, sealed and delivered.

When a complainant seeks relief against the collection of a judgment, claiming, as the ground of equity, payment of part, and release of the residue by writing, under seal, voluntarily delivered, and the answer admits these facts, but alleges that the execution of the release was procured through misrepresentation and concealment, it is an answer by way of confession and avoidance, and not a denial of the equity of the bill, such as is required to sustain a motion to dissolve a preliminary injunction.

When a part of the sum paid in settlement of a judgment, was secured by note not properly stamped, and the maker of the note seeks, by injunction, to restrain further proceedings under the judgment, he must be required to do equity, while himself seeking it, and, if found entitled to a perpetual injunction, it will be decreed upon terms protecting the defendant's rights under the note.

False and fraudulent misrepresentations, or concealment of material facts, unless they appear to have induced the party creditor to compound the release, the whole debt upon the payment of a part of it, will not invalidate, or avoid, an executed release of it. But, where the debt consists of a judgme..t, recovered in an action recently instituted, on which an execution has been issued and levied to the full amount of it, if the creditor be guilty of negligence in compromising it without consulting his attorney who was cognizant of the levy, as to the condition and security of the claims, false and fraudulent misrepresentations made by the debtor before the compromise, of his inability to pay the whole debt, and his concealment from the knowledge of the creditor of the fact, well-known to him, that the execution had been levied on his goods, and that they were sufficient to pay the whole amount of it, will not avoid an executed release of the entire debt made in consideration of the payment of a part of it.

In order to avoid a transaction on account of false representations, three things are requisite. 1st. The misrepresentation must relate to something material and substantial. 2nd. The transaction sought to be avoided, must appear to have been induced by it. The party aggrieved must have been actually misled by it. 3d. His confidence must have been a reasonable one.

Concealment, by one of the parties, in order to avoid a transaction, must be of facts which he was under an obligation to the other to communicate. The duty of disclosing facts, which may influence the adverse party to a transaction, springs either from some fiduciary relation between the parties, or from a trust understood to be reposed by one in the other about a matter of which the latter has peculiar means of information.

BILL IN EQUITY FOR AN INJUNCTION.—The facts of this case, as made by the record were, that Maclary and one Frederick W. Ridgely and Reznor had formed a mercantile copartnership of equal interest, under the name and style of Ridgely & Maclary, and had commenced business at Ridgely Station, on the line of the Maryland and Delaware Railroad, in Caroline County, Maryland, in the summer of the year 1867, and that, in the month of October following, Reznor sold his interest in the firm to him and Ridgely, and retired from it. That the two then formed a new partnership, and continued in the business under the same name as a firm, and made and delivered to Reznor, for a part of the price agreed to be paid him

for his interest in it, two promissory notes, dated October 21st, 1871, one for $500, payable to his order in four months, and the other for $1000, payable in like manner in eight months, at his office, No. 335 South Sixth Street, Philadelphia. And that, early in August, 1868, he, Maclary, sold out his interest in the firm to one James S. Dungan, who continued the business under the name and style of Ridgely & Dungan.

The bill alleged that it was then expressly stipulated and understood, that the last mentioned firm should assume and pay all the outstanding liabilities of the firm of Ridgley & Maclary, including the said notes to Reznor; and, therefore, he afterward gave himself no concern about them, and heard nothing of them until sometime in the spring of 1869.

The defendant, however, in his answer, denied that he was a party, or was privy to, or in any manner bound by, the alleged agreement between the complainant and the firm of Ridgely & Dungan, to pay off the notes; he could believe, as alleged, that complainant had given himself no concern about them, and knew nothing concerning them, although he (Maclary) well knew, and ought to have known, in the meanwhile, that they had not been paid. One reason why, during that time, he heard nothing concerning them was, that the defendant did not know where complainant was, and had been informed that he and his partner, the makers of them, were insolvent, which made him more lax in looking after and endeavoring to collect them than he otherwise would have been.

It appeared by both bill and answer, that on or about the 3d of April, 1869, the complainant went to Philadelphia, in response to a telegram from Reznor, to the effect that it would be greatly to complainant's interest to see Reznor immediately.

At this interview, as to most of which the statements of the bill and answer do not materially differ, Reznor

informed him that he had sent for him to come and see him about the notes; that they had not been paid; that he looked to him for the payment of them, and was willing, under the circumstances, to accept from him the sum of one thousand dollars in payment of them.

To this offer, the complainant replied that the offer was a very liberal one, but, as the complainant says, he wished to wait until the affairs of the firm of Ridgely & Dungan should be closed and settled, to which Reznor made no objection, but said he was willing to accept the sum of one thousand dollars in settlement and payment of the two notes. The answer says that, while complainant did say that the offer was a very liberal one, he did not accept, or offer to accept, or shew any disposition to accept it; on the contrary, he declined and refused to accept it until the affairs of Ridgely & Dungan should be wound up, about which he then knew nothing, and over which he had no control. But the offer was made for prompt payment, and not for future acceptance, after the affairs of that firm should be wound up, and was so fully understood to be by him at the time when it was made. He did not, however, say, or even intimate, that he would then be willing to accept it, but only said he wished to wait till they were wound up, which he, the defendant, regarded as a mere evasion and excuse for not settling at all, and, therefore, he pressed the matter no further. But he did not assent to the proposed delay, or say, or in any manner intimate, that he had no objection to it, for he had no thought of assenting to it. Nor could the complainant have understood him to make no objection to it, as was apparent from a letter which he received from him, written on the 23d day of October, 1869, which was as follows:

"CLAYTON, DELAWARE, Oct. 23d, 1869.

Judge, J. P. Reznor, Philadelphia, Pa.

Dear Sir: Being absent from home has caused the delay in reply to your letter which is now before me. As

you persist in having the money on those notes imme-
diately, I can only say to you that to cancel those notes I
will make to you a full and perfect title to those lots at
Ridgely, which is the only property I own in this world,
or if you prefer, I will give you one hundred dollars in
cash. You may choose between the two, which is the
best I can do. Hoping soon to hear from you, I remain,
Respectfully yours,

C. F. MACLARY.

P. S.—You could hold those lots, or you could sell
them for more than one hundred dollars. I was offered
that. Yours, Maclary."

The bill further alleged that the firm of Ridgely &
Dungan continued in business until January 1st, 1869,
when it became totally bankrupt and insolvent, and unable
to meet its engagements with reference to the payment
of the notes; and that Ridgely, one of its members, had
died a short time before the conversation, above stated,
between the parties to this suit. The defendant denied
any knowledge of these facts, or their pertinency to the
subject-matter of the complaint.

It further appeared that Reznor brought suit in the
Superior Court in and for Kent County, and recovered
judgment, for want of affidavit of defense, at the October
Term, 1869, for $1633, and on November 3d, the day
following the recovery of the judgment, there was issued
a writ of *fieri facias*, which was in evidence, and under
which a levy was made, as the return shews, November
3d, 1869, upon stock of merchandise to the amount of
$2500.

Immediately after the levy was made, there was
another interview between the parties, in Philadelphia.
The answer, however, sets forth, with respect to the cir-
cumstances under which the parties met, that,upon making
the levy, the Sheriff agreed, with the complainant, to leave

57

with him the possession and disposition of the goods upon his giving a forthcoming bond, and accepted his father, John Maclary, who was good and ample security, for the amount. At the time of the interview, the bond had not been completed, but his father had consented to become surety. Meanwhile, the defendant alleged that, at that time, and for a long time thereafter, he was in ignorance of the issue of the execution, the obtaining of a levy on the goods, or that the complainant was the owner of any property whatever.

At this juncture, then, November 8th, 1869, the complainant visited Reznor in Philadelphia and proposed to make a settlement of the notes as before proposed by the payment of $1000. An agreement for a settlement was entered into upon that basis. The complainant gave Reznor a check for $200, and it was arranged to pay the residue at Clayton, the residence of the complainant, where the defendant agreed to come the next day, and did come the next day but one, at which time a full settlement was made by Maclary giving another check for $300, which, with the prior one, was duly honored, and also a judgment note under seal, at four months, for $500 and interest, all of which were accepted in full satisfaction of the notes and the judgment thereon, upon Maclary's paying, in addition thereto, the costs, and defendant's attorney's fees in the suit. Reznor then signed, sealed and delivered to complainant the following receipt and release :

" CLAYTON, DELAWARE, November 10th, 1869.
" Received of Chas. F. Maclary five hundred dollars in
" cash, which, with his judgment note at four months, for
" five hundred dollars, is in full and complete settlement and
" payment of a judgment in the Superior Court of the State
" of Delaware, in and for Kent county, at my suit against
" Frederick W. Ridgely and the said Chas. F. Maclary, the
" same being No. 149 of the continuances to the October
" Term, A. D. 1869 of said Court ; and I do hereby ex-

"pressly release, exonorate, acquit and discharge the said "Charles F. Maclary of and from all further liability "thereon, he paying costs in the above case, and attor-"ney's fees."

Signed J. P. Reznor, and sealed as above mentioned.

The answer, while admitting what was done at this interview, as has been stated, alleged that the settlement and the execution of the release were obtained by means of fraudulent concealments and misrepresentations. That Maclary stated, in the interview at Philadelphia, as often before, that he had no property of his own, but that he now had a friend who would help him, if he could get an abatement of the amount and indulgence in time, and unless he could get that, he was not able to pay, and could not pay, or be compelled to pay anything ; but that he never even mentioned, or alluded to the fact that a judgment had been obtained against him on the notes, or that any execution had been issued thereon, or that any levy had been made upon it ; on the contrary, he studiously and fraudulently concealed the knowledge of these facts entirely from him.

That trusting the representations and the supposed honesty and fair dealing of Maclary, and urged thereto, by his pretended haste and pretence, that it was necessary for him to return home by the next train, he (Reznor,) hastily, ignorantly and unadvisedly consented to the abatement of his just demands, and to the manner of payment as hereafter stated, and thereupon received from him his check for $200, and in pursuance of the understanding and appointment, visited Clayton and signed the paper which the complainant had prepared, and presented to him for his signature ; that he was not at Clayton exceeding an hour and a half on that occasion ; that all the business was transacted between them in that brief time, and without any advice of counsel on his part, that out of

the amount received on the checks, he had to pay his attorney the sum of seventy-five dollars as his fee in the suits mentioned, while the last note referred to was without any revenue stamp upon it, which rendered it invalid, if not worthless, and was indorsed by the same person who witnessed it. And that, although the complainant was informed of those imperfections immediately on defendant's return from Clayton, by letter, and requested to correct and perfect the same, he had hitherto, altogether declined to do so.

The answer further alleged, as indicating a deliberate design on the part of the complainant to deceive and defraud the respondent in the transaction, that, after his return from Clayton, he wrote a letter to him requesting information on several points, and a copy of the receipt or settlement which he had signed ; but instead of giving the information desired, complainant sent him only a simulated copy of the receipt, with the very material alteration of the capital letter " I" inserted in the last line of it, immediately preceding the words, "attorney fee," and making it read, instead of "he" the complainant, " paying costs in the above case and attorney fee," "he paying costs in the above case and I attorney fee" and as proof that the alteration was intentional and not accidental, he never offered to pay it until it was formally tendered to his attorney on the day, and only an hour before his bill of complaint was filed, and after he had absolutely repudiated and refused to abide by the fraudulent settlement and imposition practiced upon him. And, as further evidence of the bad faith of the complainant, and of the false and fraudulent misrepresentations made by him in the matter, by which he had purposely misled and entrapped him into such a settlement, the answer set forth copies of several other letters received by him, from the complainant, between the 12th of October and the 6th of November, 1869, professing an earnest desire, but asserting his utter inability, to pay the notes, and expressly

stating, among other things, in one addressed to him on the 2d of November, 1869, in the following words : "I own "nothing only as I wrote to you some time ago. I have sold my store some time since, but to satisfy you I would "be willing to pay you what I can afford :" and even when he visited Clayton, on the 10th of that month, he again assured him that he was worth nothing, and had no property or money with which to pay the demands, and again affirmed that he had sold his store. But on no occasion, nor in any letters, did he mention or allude to the suit instituted on the notes, or the judgment, execution or levy ; nor had the defendant, until after the date last mentioned, and after the settlement made and receipt given, received any information or advice, whatever, from his attorney concerning them.

After setting forth the settlement made, as the bill further stated, that the complainant had since paid the costs to the Sheriff, and prior to filing his bill of complaint, had duly tendered to the attorney for the plaintiff in suit, seventy-five dollars, the amount of his fee agreed upon between them, which he had declined and refused to accept, and which amount he had, thereupon, deposited in the hands of the Register in Chancery, subject to the order of that Court. That the writ of *fieri facias* still remained in the hands of the sheriff, who, by the instructions of Reznor, through his attorney, was proceeding with the execution of it against him, contrary to the said agreement, settlement and release of the said judgment, most wrongfully, and unjustly, and contrary to equity and good conscience, to the great injustice, detriment, and injury of the complainant, unless restrained by the injunction of that court. The prayer of the bill was, therefore, for a preliminary, and also a perpetual, injunction, restraining the sheriff, Reznor, and his attorney, from proceeding further in the execution of the judgment against him.

At the Sept. Term, 1869, upon answer filed, a motion was made on behalf of the defendants to dissolve the injunction, upon which argument was heard, Dec. 22, 1869.

*Fulton*, for the defendants.

1. The bill shews no equity.

The paper set forth as a release, appears, by the bill, to have been without consideration. The paper, being under seal, would, taken. alone, import a consideration ; but this presumption is removed by the statement of facts. From this, it appears that for the promise to accept the $1,000, in full, the complainant suffered no loss, and the defendant gained no advantage. The whole debt was due presently, and in course of collection.

2. Since the answer responsively denies the equity of the bill, if there be any, the injunction should be dissolved. *Manchester vs. Dey*, 5 *Paige* (*N. Y.*) 112 ; *Perkins vs. Hallowell,* 5, *Ired. Eq.*, 24 ; *McDaniel vs. Stoker, Ib.*, 274 ; *Trustees Newark Co. vs. Gilbert*, 1 *Beaslee*, 78 ; 3 *Dan. Ch. Pr.* (*Ed'n*, 1865) 1786. The exception, founded on the doctrine of irreparable injury, applies only to torts or cases of that nature, such as waste, infringement of patents, or copy-right, or abuse of partnership rights. The doctrine is in no instance applied to injunctions restraining legal proceedings. Irreparable injury cannot result from compulsory payment of money, for that may be repaired by money ; nor does the ability of a party to refund, enter into the question. It is a legal question depending upon the nature of the injury, and not upon the special circumstances of the parties.

*Massey*, for the complainant.      •

1.　As to the defendant's second ground, dissolving a special, as distinguished from the common, injunction of the English practice, is not a matter of course, but rests in sound discretion. *Poor vs. Carleton,* 3 *Sumn.* 70. A dissolution will not be decreed when it would work irreparable injury. *Roberts vs. Anderson,* 2 *Johns. Ch.,* 204; *Bank of Monroe vs. Schemmerhorn,* 1 *Clarke,* 303; *Swindall vs. Bradley, Jones, Eq.,* 353. This is, upon the facts, such a case.

2.　The answer does not deny the facts, out of which the equity arises, but confesses and avoids. The answer must deny all the circumstances alleged. 1 *Sm. Ch. Pr.,* 601 *note.* This answer admits all the facts alleged,—the agreement to compound the debt, the payment of the $200, the giving of a new note, the execution of the release and tender of counsel fees, and sets up a new case, that is, that the release was obtained through fraud and circumvention. *Minturn vs. Seymour,* 4 *Johns. Ch.,* 173; *Ches. & O. Canal Co., vs. B. & O. R. R. Co.,* 4 *G. & J* 7; *Livingston vs. Livingston,* 4 *Paige (N. Y.)* 111; *Wakeman vs. Gillespie,* 5 *Paige (N. Y.)* 112; *Everly vs. Rice,* 3 *Gr. Ch.,* 553; *McFarland vs. McDowell, N. Car. Law Rep.,* 110; *Gibson vs. Tilton,* 1 *Bland,* 353; *McNamara vs. Irwin,* 2 *Dev. & Bat.,* 13; *Lindsay vs. Ethelridge,* 1 *Dev. & Bat.,* 36; *Adams, Eq.,* 431-(196.

3.　The injunction cannot be dissolved if the answer is contradictory to itself. *Town vs. Oliver,* 1 *Bland,* 199.

4.　The first ground of the motion,—want of equity in the bill has three distinct answers.

(1.) It is an objection which comes too late, after the answer is filed. It must be taken before answer, by which the defendant is estopped from denying the equity of the bill.

(2.) There was, in fact, sufficient consideration for the release, in the undertaking for counsel fees which was no obligation, and the immediate cash payment.

(3.) The seal imports consideration not merely as an inference of fact but a legal consequence. It is a release *executed*; a present and absolute discharge of the judgment, effectual, whether voluntary, or upon consideration.

THE CHANCELLOR :—

The motion is to dissolve the injunction issued in this cause, and is made upon two grounds.

*First.* The want of equity in the bill.

It is insisted for the defendant, that his promise to accept $1000, in full satisfaction of the debt due from Ridgely & Maclary, was without consideration, and that this appearing on the face of the bill, removes the equity which, *prima facie*, the complainant has arising out of the written release executed by the defendant.

We need not consider whether, supposing Reznor's promise to compound this debt still remained executory, there arose out of the circumstances a sufficient consideration to make it obligatory. That is not the question, but, rather, what is the legal operation of the paper executed by Reznor. A copy is set forth in the bill. It is a formal release to Maclary of "all further liability" on the judgment, signed, sealed and delivered. Being an instrument under seal, no consideration is required to make it effectual. A man may give a voluntary bond, or he may gratuitously release to another, any right whatever, provided he does not thereby defraud his creditors, and executes the bond, release, or other instrument, with due legal solemnities, as by writing, sealed and delivered. This technical effect of a sealed instrument is too familiar

to need authority ; yet I may refer to 2 *Black. Com.*, 446 ; *Plowden*, 308 ; *Cruise's Digest* ; *Tit. Deed*, *Ch. II, Sec.* 33. *T. T. R.*, 475. The effect is the same in equity as at law. 1 *Fonblanque*, 334. (*Ed'n of* 1793) ; *Chitty on Cont.*, 5.

*Second.* The other ground of the motion to dissolve is that the answer denies the equity of the bill. I am not able so to read it. The relief sought by the complainant is against the collection of the judgment. His equity arises out of the payment of part and the release of the residue by writing under seal, alleged to have been voluntarily delivered by Reznor, the release to be upon condition that Maclary pay the defendant's counsel fee and all costs. It is alleged that the costs were paid and counsel fee tendered and refused. It is now brought into Court. These facts the answer admits, or, certainly, does not deny; but it alleges in defense that, although true it is, that Reznor did so execute and deliver the release, yet that he did it in ignorance of judgment having been obtained, and execution issued and levied, whereby his debt had been secured ; that had he known these facts, he would have chosen to abide by the judgment and execution ; that it was the duty of Maclary to have communicated these facts ; that the omission to do so was a fraudulent concealment ; that he also falsely represented that he had sold his store, and had no property, except some lots at Ridgely, worth about $100. In all this, the defendant does not deny the execution of the release, which is the ground of the complainant's equity, but he sets up a counter equity in himself, to be relieved against the release upon the ground of mistake and fraud. It is plainly an answer by way of confession and avoidance, and not a traverse ; and, according to the settled practice, it does not sustain a motion to dissolve the preliminary injunction. *Adam's Equity* [196], note and cases cited.

This is not like the case put in argument for an answer, alleging that a paper, relied on by the bill, as a release, has

been stolen or obtained by artifice, or otherwise than by a voluntary delivery. Such an answer would, in effect, traverse the execution of the release ; for a voluntary delivery of the paper is one of the legal requisites. But in this case, all the requisites to the execution and legal effect of the release are admitted, *i. e.*, that, in terms, it discharges the judgment, and that is was signed, sealed and delivered.

The motion to dissolve the injunction must be denied.

There is an allegation in the answer which may properly be noticed at this stage of the cause. It is the absence of a revenue stamp on the note for $500, given by Maclary as part payment of the judgment. The complainant will be required to do equity while himself seeking it ; and if, at the hearing of this cause, he shall be found entitled to a perpetual injunction, it will be decreed upon terms protecting the defendant's rights under this note:

The decision of the motion to dissolve was rendered January 5th., 1870, and on February 5th., following, the cause came on to a final hearing. It was proved by a deposition read for the defendants, that the complainant was in mercantile business at Clayton, in October 1869, and also in the spring of the year. The other matters of evidence were certain facts agreed upon by the counsel to be considered as if proved, viz ;

1. That the paper set forth in the bill as a release is a true copy of the original, which was duly executed.

2. That the costs on the judgment and execution were paid by complainant as alleged in the bill.

3. That the copies of defendant's letters set forth in the answer, are true copies of the originals.

4. That since the present was filed, George W. Kugler. as a creditor of the defendant, attached the complainant

as a garnishee of the defendant, and recovered judgment against him for $417.55, which has been paid.

*Massey*, for the complainant.

The paper alleged as a release is such in form and effect, and discharged the judgment unless impeached for fraud. This it is sought to do, alleging that it was obtained by fraudulent misrepresentations in the letters of October 23d and November 2d, 1869.

Misrepresentation, even if proved, does not avoid a transaction, unless it appears that it was relied on and was the inducement. 1 *Sto. Eq. Jur., secs.* 191-195 ; *Doggert vs. Emerson, et al.,* 3 *Sto. C. C.,* 700. There was misrepresentation in the letters, but it does not appear that Reznor relied upon it, and was induced by the letters. His offer was first made in the spring without any prior representation by complainant.

Concealment is only fraud when it is of facts peculiarly within a party's knowledge. *Pierce vs. Wood,* 3 *Foster,* 520 ; *Reynolds vs. French,* 11 *Vt.,* 674. The execution here alleged to have been concealed was a matter of record. The judgment is mentioned and released in the paper signed. Defendant had counsel, and was bound to inquire as to the condition of his claim, and between the 12th October, when the representations complained of were made, and the 8th and 10th of November, when the bargain was made and the release signed, he was in communication with his counsel and had ample opportunities to inquire.

*Fulton*, for the defendant.

1. There was, in fact, no consideration for the settlement. The seal imports one, but that is a mere

presumption, which may be, and, in this case, is, rebutted by the facts. *Cabot vs. Haskins*, 3 *Pick.*, 83 ; *Sweeny vs. Hunter*, 1 *Murph.*, 181 ; *Smith vs. Bartholomew*, 1 *Metc.*, 276 ; *Shorb's Ex'r. vs. Shultz*, 43 *Pa. St.*, 207 ; *Crowhurst vs. Laverack*, 16 *Eng. L. & Eq.*, 497.

2. Acceptance of part of a debt is no satisfaction when the whole is due. *Lovelace vs. Cocket, Hobart*, 68, and notes ; *Geäng vs. Swain*, 1 *Lutw.*, 464.

3. The misrepresentation is admitted. For what purpose was it, if not to influence Reznor. The motive was unquestionable, and a court of equity will not relieve a party confessedly guilty of fraud and falsehood. The concealment alleged is not of the judgment, but of the execution. The facts constitute a case of fraud under the authorities. *Maddeford vs. Austwick*, 1 *Sim.*, 89 ; *Lewis vs. Gamage*, 1 *Pick.*, 374 ; *Reynolds vs. French*, 11 *Vt.*, 674.

THE CHANCELLOR :—

This case draws into question the validity of a release under seal by the defendant, Reznor, of a judgment held by him against the complainant, Maclary, for $1633.33, recovered in the Superior Court, at the October Term, 1869.

That the release was executed and delivered, and is in due form, is not disputed ; but the defendant insists that it is invalid upon two grounds ; (1) that it was without consideration ; and (2) that it was obtained by fraudulent misrepresentation.

The first of these grounds of defense, viz ; the want of consideration, has been, heretofore, argued and disposed of upon the motion made to dissolve the injunction for want of equity in the bill. Part payment of a debt is not a sufficient consideration to support an executory promise to discharge the debtor, and were this the case of an

agreement to release, remaining still *in fieri,* the defense of want of a valid consideration would be available. But this being a release under seal, complete in its terms and duly executed, it needs no consideration to support it beyond what the seal imports. It would be effectual, even had it been wholly gratuitous and without payment of one cent by the debtor. This point is more fully stated, and the authorities cited, in the opinion given upon the motion to dissolve.

The other defense, and the one mainly relied upon at the hearing, was fraud in obtaining the release. And the fraud was alleged to have been twofold, viz: misrepresentation by Maclary as to his means of payment, and the concealment by him of the fact that an execution had been levied to an amount sufficient for the whole debt. These two charges admit of separate consideration.

1st. As to the alleged fraudulent misrepresentations. The facts material to this point are these: The notes of Ridgely and Maclary, upon which the judgment was recovered, being one for $500, at 4 months, the other for $1,000, at 8 months, both dated October 21, 1867, matured, the former in February, 1868, the latter in June of that year. Reznor took no steps toward their collection until the 3rd of April, 1869, when, by a telegram, he invited Maclary to visit him in Philadelphia, with a view to a settlement. His inattention to the notes until that date, are explained in his answer, by the fact that he had been informed, and supposed, that both Ridgely and Maclary were insolvent, and further, that he did not know where Maclary then resided, the latter having left Maryland, in which state Reznor had last known him; that, being, about this time, informed that Maclary was residing at Clayton, in this State, he sent the telegram with a view to obtaining some settlement of the notes. Maclary promptly responded by calling on Reznor in Philadelphia,

and thereupon Reznor voluntarily offered to take $1,000, cash, in full settlement. This offer, as the answer shows, was not induced by any representations then made by Maclary, as to his means, nor even by any solicitation on his part. It was made, as Reznor states, in view of the information he had previously received, that Ridgely and Maclary were insolvent, and also upon his considering that, even, if they were not wholly insolvent, he might be put to expense, delay, and risk in the collection. So, being anxious to stimulate Maclary to prompt effort, and to save something without further delay or risk, he proposed to accept the $1,000 in full, intending thereby to make a liberal and tempting offer. Maclary, however, did not then accede to it. Whether, as he alleges, the offer remained a standing one, subject to his further considera- tion, or whether, as the defendant insists, it was then rejected and withdrawn, is not material. There was no further negotiation until October, 1869, when some cor- respondence ensued, caused, doubtless, by the institution of the suit, but resulting in nothing. Soon after, a judgment being recovered, execution was issued and levied, November 3rd, 1869, upon a stock of merchandize valued at $2,500, in Maclary's possession at Clayton, where he was in business as a merchant. The levy quickened Maclary's diligence, for, having induced the Sheriff to defer closing the store until the 9th of Novem- ber, by undertaking, in the meantime, to give security for the forthcoming of the goods, he repaired to Philadelphia on the 8th of November, and in an interview then held with Reznor, the latter again assented to accept $1,000, with the costs, and his attorney's fee, in full discharge of the judgment. Whether his proposal to do so was, as before, voluntary, or whether induced by any representa- tions on the part of Maclary, made during that interview, does not appear, nor is this material. A check was given by Maclary for $200, and a meeting appointed, at Clayton, on the 10th of November, to carry out the settlement.

On the day appointed, Reznor attended at Clayton, where he received another check for $300, and a note under seal at four months for $500, making up the $1,000 to be paid, and thereupon the release was executed.

Now, the fraudulent misrepresentations relied upon as avoiding the release are contained in two letters from Maclary, dated, respectively, October 23d, and November 2d, written shortly prior to the settlement.   In the letter of October 23d, he writes, "As you persist in having the money on those notes, immediately, I can only say to you that to cancel those notes I will make to you a full and perfect title to those lots at Ridgely, which is the only property I own in this world, or, if you prefer, I will give you one hundred ($100) dollars in cash.   You may choose between "the two, which is the best I can do." He adds in a P. S., "You could hold those lots, or you could sell them for "more than one hundred dollars, as you choose ; I was "offered that."   In the letter of November 2d, writing of his desire to compromise, he says, "I own nothing only "as I wrote you some time ago.   I have sold my store "some time since, &c."

These representations were false, for Maclary, at the time of writing these letters, was still merchandizing, and held a stock of goods valued at $2500, which had not, so far as any evidence shows, been sold by him, as was stated in his letter of the 2d of November, but were on the next day, 3d of November, levied on as his goods, and he gave a forthcoming bond for them.

Nevertheless, I am of opinion that these false representations do not, under the circumstances, avoid the release ; and this for two reasons.   In the first place, it does not appear that it was by Maclary's statements that Reznor was induced to compromise the debt.   His original offer, in April, 1869, to accept $1000 in settlement, was made as the answer itself shows, under no inducement

proceeding from Maclary, but was prompted by Reznor's own distrust of the debt and his anxiety to avoid trouble, caused by rumors of the insolvency of Ridgely and Maclary. This belief of the insecurity of the debt, and his willingness to settle at $1000, continued to possess his mind; nor can I see that the representations in Maclary's letters made any impression upon him. The same distrust and anxiety for a settlement which prompted his first offer to accept $1000, was the continuing inducement to accept it at the last, and would have led to precisely the same result had Maclary written nothing about his means. But the other, and perhaps, upon the facts, a less questionable ground for sustaining the release, arises out of Reznor's negligence in compromising the debt without inquiry of his attorney, who was cognizant of the levy, as to the condition and security of the claim. The most ordinary diligence in this respect would have brought full information of the levy.

The rule of law as to the effect of false representations is a clear and settled one. In order to avoid a transaction on account of them, three things are requisite.   1st. The misrepresentation must relate to something material and substantial.   2d. The transaction sought to be avoided, must appear to have been induced by it.   The party aggrieved must have been actually misled by it.   And 3rd. His confidence must have been a reasonable one ; as where the matters misrepresented are such as, from their nature, rest peculiarly in the knowledge of the party making the statement, or where there are fiduciary relations between the parties to warrant the trust reposed ; or where the party misled is of such weak mental capacity as to be exempt from the requirement of ordinary diligence.   Except in these cases, even betrayed confidence is not a ground of relief.   Where no confidential relation exists, nor mental incapacity, and the means of information are open to both partles, a diligent use of which would have prevented the injury, Equity will not interfere, *Vigilantibus non dormientibus leges subveniunt.* 1 *Sto. Eq. Jur. Sec.* 191.

2d. The other circumstance of fraud relied upon, as avoiding the release is, that Maclary, pending the negotiation, did not disclose the fact that an execution had been levied on his goods to the full amount of the debt. But to this the obvious and conclusive answer is, that he was under no obligation to communicate these proceedings to Reznor. They were proceedings had under Reznor's own process, directed by his attorney, and with respect to which it was his duty to seek information from his attorney. He was not warranted to rely, and in fact did not rely, upon Maclary. The duty of disclosing facts which may influence the adverse party to a transaction, springs either from some fiduciary relation between the parties, or from a trust understood to be reposed by one in the other, about a matter of which the latter has peculiar means of information. But these parties were dealing at arms' length, and the fact not communicated, to wit ; the levy of the execution, was equally ascertainable by both. " The true definition " says Justice Story," of undue concealment, which amounts to fraud in the sense of a court of equity, and for which it will grant relief, is the non-disclosure of those facts and circumstances which one party is under some legal or equitable obligation to communicate to the other, and which the latter has a right, not merely in *foro conscientiæ* but *juris ét de jure* to know. 1 *Sto. Eq. Jur. Sec.,* 207 ; 2 *Kent. Com.,* 482, and *note (a,) 5th. Ed'n.*

Were this the case of a mere agreement to discharge the judgment remaining still unexecuted, a court of equity might, considering the advantage gained, to be an unconscientious one, refuse to enforce it upon a bill for specific performance ; but the release having been executed, and being such as, under the circumstances, the Court would not, on a cross-bill avoid, I feel obliged to give it its legal effect.

Decree affirmed by the Court of Errors and Appeals, at the June Term, 1871. See 4 *Houston's Del. Rep.,* 154.